**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CARISA JOHNSON,** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | **JURY DEMAND** |
| vs. | ) | |
| | ) | |
| **GRUBB PROPERTIES, LLC and** | ) | |
| **GRUBB MANAGEMENT, LLC,** | ) | |
| | ) | |
| DEFENDANT(S). | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Carisa Johnson ("Plaintiff" or "Ms. Johnson"), by and through counsel of record, files her Complaint against GRUBB PROPERTIES, LLC. and GRUBB MANAGEMENT, LLC ("Defendant" or "GRUBB"), and states as follows:

## I. INTRODUCTION

1. This is a civil action to make whole the Plaintiff for denial and interference with the exercise of rights guaranteed by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADAAA"), including the right to be reasonably accommodated without interference or retaliation, retaliation for request and use of a reasonable accommodation, and be free from discrimination against her on account of Plaintiff's specific and regarded-as disabilities. Further, Plaintiff sues GRUBB for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as codified as 42 U.S.C. §§ 2000e et seq.

## II. PARTIES

2. Plaintiff, at all times relevant to this Complaint, resided in Shelby County, Tennessee.

3. Defendant Grubb Properties, LLC is a commercial entity incorporated in the State of North Carolina, with its principal corporate address at 4601 Park Road, Suite 450, Charlotte, NC 28209. At the time of the events subject of this Complaint herein, Defendant regularly did business in the Memphis, Shelby County, Tennessee area and employed more than 15 people in the said area, and over 200 nationwide, at the time of the facts that form the basis of this Complaint.

4. Defendant Grubb Management, LLC is a commercial entity incorporated in the State of North Carolina, with its principal corporate address at 4601 Park Road, Suite 450, Charlotte, NC 28209. At the time of the events subject of this Complaint herein, Defendant regularly did business in the Memphis, Shelby County, Tennessee area and employed more than 15 persons in the said area, and over 35 nationwide, at the time of the facts that form the basis of this Complaint.

5. Grubb Properties, LLC is the member of Grubb Management, LLC.

6. Grubb Properties, LLC owns and controls Grubb Management, LLC.

7. Grubb Management, LLC is a subsidiary of Grubb Properties, LLC.[1]

8. Valid service of process may be obtained on Defendant Grubb Properties LLC via its registered agent in North Carolina: CT Corporation System, 160 Mine Lake Ste. 200, Raleigh, NC 27615.

---

[1] Hereafter, Plaintiff shall refer to Grubb Management, LLC and Grubb Properties, LLC collectively as "GRUBB"

9. Valid service of process may be obtained on Defendant Grubb Management, LLC via its registered agent in Tennessee: CT Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

## III. JURISDICTION AND VENUE

10. Plaintiff brings this action under 28 U.S.C. § 1331, alleging the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and employment law protections.

11. Venue is proper in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful employment practices occurred within Shelby County, Tennessee, where Plaintiff works, where Plaintiff suffered the unlawful employment practices and resultant damages, and where Plaintiff would have continued to be employed by Defendant during the below referenced time period in the absence of its unlawful employment practices.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff has met all procedural requirements for filing this Complaint, including administrative exhaustion required for jurisdiction in this Court.

13. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission and did so within 300 days of the actions of which she complained. Plaintiff filed her Charges for violations of the ADAAA and Title VII on March 8, 2024 (Charge No. 490-2024-01476). On or about January 31, 2025, Plaintiff received her *Right to Sue Notices* from the EEOC for the aforementioned Charges and, therefore, concluded the process of exhaustion requirements with the EEOC. Accordingly, this lawsuit and supporting Title VII and ADAAA claims are

properly and timely filed within ninety (90) days of issuance by the EEOC of Plaintiff's Notices of Right to Sue Letter on January 31, 2025. **(Exhibit 1, "Notice of Right to Sue").**

## V. STATEMENT OF FACTS

14. Following her interview with Hiring Manager Jason Rushing on October 31, 2022, GRUBB hired Carisa Johnson a.k.a. Carisa Johnson-Boyd ("Ms. Johnson") as a Senior Property Manager on November 10, 2022. She was terminated by GRUBB on February 16, 2024.

15. Ms. Johnson was hired as a Senior Property Manager (and later terminated), as referenced in the Paragraph above, by Grubb Properties, LLC.

16. Despite being an employee of Grubb Properties, LLC, Ms. Johnson's W2 came to her from Grubb Management, LLC.

17. Grubb Management, LLC was a joint employer of Ms. Johnson along with Grubb Properties, LLC, though Grubb Properties, LLC made both the decision to hire and fire Ms. Johnson.

18. Before taking the position with GRUBB, Ms. Johnson enjoyed an accomplished career with 16 years of property management experience.

19. Ms. Johnson possessed a bachelor's degree and a Certified Pool Operator Certification.

20. Ms. Johnson's position with GRUBB was to oversee the property's daily operations and leasing of units at *Link Apartments Broad Memphis*, specifically pre-leasing units, marketing, and conducting interviews for potential team members.

21. She also attended Owner Architect Contractor meetings, walked units, and coordinated with the construction manager to find local vendors and secure permits.

22. With Rushing's approval, Ms. Johnson proposed the hiring of Leasing Professional, Adelyn Wells, Maintenance Supervisor Darrell Riley, Assistant Manager Marquis Holman, and lastly, Leasing Manager Priscilla Hough and Maintenance Technicians Fred Lucas and Lupe Perez. Later, after obtaining approval from Rushing, Ms. Johnson terminated Ms. Wells and hired Ms. Cherrise Batla as Ms. Wells' replacement.

23. GRUBB notified Ms. Johnson that it wanted to obtain 200 move-ins at Link Apartments Broad by December 2023 so it could meet the financial terms of a property loan. As a result, Ms. Johnson's team was asked to obtain 40 move-ins by August 2024, with incentives of double commissions offered by GRUBB.

24. This goal was met by Ms. Johnson's team, despite the office closing for a week during August because of COVID infections, including Ms. Johnson and two other team members.

25. GRUBB was satisfied with said results and awarded Ms. Johnson's team with a dinner joined by the leadership team, including Senior Development Associate Chris Deberry and Jason Rushing.

26. By October 2023, GRUBB's Senior Marketing Director Christian Collins specifically praised the performance of Ms. Johnson and her team to Robert Loeb, the fifty percent equity partner and owner for Link Apartments Broad, referencing their handling of an event occurring on the prior day as: "The attention to detail, the level of focus and the desire to make these events successful is unrivaled."

27. On November 7, 2023, Ms. Johnson was informed by her physician, Dr. Helena Shannon, that she was anemic due to menorrhagia. Ms. Johnson's symptoms of menorrhagia included heavy and prolonged menstrual bleeding for about 28 days of the month, heavy menstrual

cycles, as well as hot flashes, mood swings, and chaffing due to constant use of feminine products meant to be used for short terms and not everyday use.

28. The symptoms, as referenced in the paragraph above, interrupted a variety of Ms. Johnson's major life activities, including Ms. Johnson's ability to sleep normally, to concentrate, walk, to exercise, sit for extended periods, performing household chores, parenting tasks such as picking up her child, and socializing due to her fatigue and constant bleeding.

29. Ms. Johnson also suffered from thinning hair and loss of energy compared to normal levels before she began suffering from menorrhagia.

30. The above listed symptoms affected Ms. Johnson for over a year before she received medical advice to obtain a hysterectomy in November 2023.

31. Following her hysterectomy and the removal of one ovary, Ms. Johnson also suffered substantial limitations to the operation of a major bodily function, including functions of her bladder, endocrine, and reproductive functions.

32. Prior to taking leave for her above stated surgery, Johnson specifically informed Jason Rushing and the payroll manager, Ms. Debra Jordan, about her diagnosed uterine fibroids and enlarged uterus, her resulting prolonged fatigue, and her medically advised need for a hysterectomy due to her bleeding she suffered about 28 days out of the month.

33. Dr. Helena Shannon completed medical leave paperwork on December 7, 2023, identifying Ms. Johnson's first symptoms as occurring in September 2022 and the date of her first treatment in November 2022. As a result, Dr. Shannon advised Ms. Johnson not to perform any work functions for six weeks following the hysterectomy operation.

34. In mid-November 2023, Ms. Johnson notified Vice President Jason Rushing and GRUBB HR Director Katie Noble Saxon that she was scheduled for an abdominal hysterectomy on December 11, 2023.

35. Mr. Rushing replied that Ms. Johnson would need to confirm with him the details of the surgery dates and how long she would be off work.

36. Ms. Johnson remained working until Sunday, December 10, 2023, specifically, decorating the apartment for Manager Duffney to use while Ms. Johnson took medical leave.

37. At the time Ms. Johnson took leave for the hysterectomy, she had encountered no formal discipline.

38. While on medical leave between December 11, 2023, and January 22, 2024, Ms. Johnson continued to perform certain work duties at the request of GRUBB.

39. Specifically, while on medical leave, Ms. Johnson reviewed a janitorial contract and performed administrative tasks for the property because Area Manager Rachel Duffney did not know how to approve certain billing tasks.

40. On December 11, 2023, Ms. Johnson updated Rushing that her surgery had resulted in the removal of one of her ovaries.

41. During Johnson's medical leave, Rushing was promoted to Senior Vice President of Asset Management, and Britney Crandall was promoted to Regional Property Manager.

42. Despite her promotion, Manager Crandall remained primarily based at GRUBB's offices in North Carolina.

43. Before the time of Crandall's appointment as Regional Property Manager, Ms. Johnson had met Crandall on about three past occasions, all of which were cordial and professional.

44. In late December 2023, Johnson informed Manager Crandall that she anticipated several additional medical appointments to be scheduled after she returned to work in January 2024.

45. Ms. Johnson attended two follow-up post-op medical appointments prior to her termination.

46. On January 2, 2024, Crandall reviewed Ms. Johnson’s doctor's note confirming her hysterectomy as the reason for her use of medical leave.

47. On January 10, 2024, Manager Crandall text messaged Johnson to request a chat about personnel changes in Memphis.

48. On January 12, 2024, Ms. Johnson informed Manager Crandall that Johnson’s team won the "best fitness center" award.

49. On January 17, 2024, Crandall text messaged Ms. Johnson to request that they talk before she returned to work from medical leave, and that Andrew Little would be visiting the Memphis location to act as “coverage” for Ms. Johnson. However, Ms. Johnson had made no request for assistance or coverage in her work duties.

50. On January 19, 2024, Manager Crandall text messaged Ms. Johnson not to terminate a member of staff while Johnson was still out on medical leave.

51. Ms. Johnson returned to work on January 22, 2024, a day earlier than originally scheduled, following her approved medical leave for treatment of uterine fibroids and a hysterectomy.

52. Johnson was not asked to provide a medical release statement when returning to work following her hysterectomy, as required by GRUBB policy.

53. On January 22, 2024, at Manager Crandall's direction, Property Manager Andrew Little arrived in Memphis to "assist" Ms. Johnson perform her job.

54. On January 23, 2024, Ms. Johnson received a verbal warning from Manager Crandall, first by via a *Teams* meeting, followed by an email attached GRUBB form.

55. The discipline on January 23, 2024, was the first ever verbal warning issued to Johnson by GRUBB.

56. Ms. Johnson was stunned by the verbal warning because the listed claims against her by manager Crandall were generalized and lacked any specificity or examples.

57. The verbal warning included claims against Ms. Johnson that were false or unfair because the related issues of concern listed by Manager Crandall arose while Ms. Johnson was on medical leave.

58. The documented verbal warning from Crandall included the statement, "Date by which improvement must be made: Immediately – 60 day improvement is required – check ins and conversations will occur during this time frame. Date of next scheduled counseling session: As needed."

59. Between the date of the verbal warning and Ms. Johnson's termination, Manager Crandall did not bring up the same complaints or reference her alleged claims made in the verbal warning.

60. Without referencing any specific incident or date, the documented verbal warning by Crandall alleged deficiencies with Johnson's (1) Sense of urgency; (2) team engagement and involvement; (3) credit and purchases; (4) rent and money; (5) audit; and (6) integrity of workplace decisions.

61. GRUBB did not use a progressive discipline policy during Johnson's period of employment.

62. However, based on GRUBB's Employee Handbook, which was in effect in January and February 2024, GRUBB relied on a list of various disciplinary actions that it could take against a GRUBB employee. For example, GRUBB may issue a Verbal Warning that must be documented, without any requirement for an employee to sign.

63. GRUBB may also issue a Written Warning, which requires the employee to sign, and may include a performance improvement plan, with approval from HR.

64. Next, GRUBB will issue a Final Warning, placing the issues in writing and requiring the signature of the employee and the supervisor.

65. GRUBB also allows for Probation of an employee, where the employee will be expected to reach certain goals or meet certain performance expectations during the term of Probation.

66. GRUBB's discipline policy also allows for suspension without pay.

67. As a result of the verbal warning, Ms. Johnson asked GRUBB Human Resources about the disciplinary action but was informed to talk only to Manager Crandall.

68. Beginning on February 12, 2024, Regional Manager Crandall visited GRUBB's Memphis location and Ms. Johnson's workplace for one week.

69. This was Crandall's first visit to the Memphis location during Ms. Johnson's employment with GRUBB.

70. During each of the days from February 12th through 15th, 2024, Manager Crandall met in person with Ms. Johnson and made no mention of possible termination, or any allegations

Manager Crandall made against Ms. Johnson in the verbal warning, or any claims subsequently noted in the termination notice issued to Ms. Johnson.

71. On several occasions while talking with Manager Crandall during February 12th through 15th, 2024, Ms. Johnson explained that, because of her hysterectomy while on medical leave, she was physically moving more slowly because she was still in physical pain, and, that she needed to sit on a special pillow because of the pain.

72. During this time period, as discussed in the paragraph above, while walking slowly with Manager Crandall and unable to keep up with her same pace, Ms. Johnson told Crandall that it still hurt for her to walk because of being "cut from hip to hip." Crandall looked directly at Ms. Johnson but made no verbal comment in response.

73. During the days of February 12th through 15th, 2024, Ms. Johnson also asked Manager Crandall if she could wear tennis shoes as an exception to the GRUBB dress code because it hurt to wear heels while she was still in pain caused by her hysterectomy.

74. Crandall replied with a dramatic gasp of annoyance at Ms. Johnson's request to wear tennis shoes and replied that Ms. Johnson should put her request in an email to her. As a result, Ms. Johnson sent an email request to Crandall. However, Ms. Johnson received no response from Manager Crandall.

75. On February 16, 2024, Ms. Johnson was terminated by Manager Crandall, with Crandall claiming she "felt a sense of overwhelm coming" from Ms. Johnson and she believed "this job was too much for [her]."

76. Manager Crandall presented Ms. Johnson with a written Termination Notice, making several false and misleading allegations, namely, "You have demonstrated failure to

improve and maintain performances on the previously discussed performance/behavior issues, so this will result in termination of employment."

77. Ms. Johnson disagreed with the allegations and refused to sign the termination document.

78. Ms. Johnson next sent a text message to Vice President Jason Rushing to ask if he had known she was going to be terminated. Rushing called Ms. Johnson back that same day and assured her that he did not know about her termination and asked her what exactly had happened.

79. Rushing was not consulted about Ms. Johnson's termination before she was terminated by Crandall.

80. In the Termination Notice issued to Ms. Johnson, Manager Crandall claimed Ms. Johnson "hid" (or removed from view on the property's website) over 36 units in May 2023, and Crandall discovered that the units were still not being advertised for lease in January 2024.

81. In fact, Ms. Johnson's access level to the property management software did not give her permission to control the marketing website, including the ability to hide or remove from view any of the units.

82. Further, regardless of the alleged hidden units, there remained over 150 units shown as available to lease on the website.

83. The Termination Notice issued to Ms. Johnson also claimed that she did not intercept advertisements on Airbnb for units on the property or notify the leaseholders responsible for the violation.

84. In fact, the Airbnb advertisements were made by a corporate leaseholder in good standing who was notified by Ms. Johnson promptly after Manager Crandall brought it to her attention that the units were not to be advertised on Airbnb.

85. As a result of Ms. Johnson's communication to the corporate leaseholder referenced in the paragraph above, the leaseholder complied.

86. The Termination Notice issued to Ms. Johnson also claimed that she procrastinated on electricity activation for residents and the transfer of utilities to the residents' names.

87. In fact, the responsibility for electricity activation for residents and the transfer of the utilities to the residents' names was the job of Project Construction Manager Mike Pickering (Male).

88. Pickering's work duties included ensuring that the correct documentation is received from MLGW.

89. Mr. Pickering was not disciplined because of any delays in electricity activation for residents or issues with transfers of the utility to the residents' names.

90. The Termination Notice issued to Ms. Johnson also claimed she was not readying vacant apartments for leasing online.

91. In fact, construction turns the unit over to Mr. Pickering, who then decides if the unit is accepted and ready to lease.

92. After the unit was deemed ready to lease by Pickering, Ms. Johnson did not delay the online leasing of those units.

93. Further, Ms. Johnson personally showed Manager Crandall the units that remained unfinished but had still been deemed as ready to lease by Pickering.

94. These units shown by Ms. Johnson to Manager Crandall were demonstrably unclean and included unfinished bathrooms.

95. Manager Crandall agreed with Ms. Johnson that the units were not ready to be leased or advertised as ready to be leased.

96. Mr. Pickering was not disciplined because of his approval to lease units that were unclean and still contained unfinished bathrooms.

97. During her employment with GRUBB, Ms. Johnson was not issued a Written Warning.

98. During her employment with GRUBB, Ms. Johnson did not receive a suspension.

99. During her employment with GRUBB, Ms. Johnson was not placed on probation.

100. During her employment with GRUBB, Ms. Johnson received discipline for the work performance failures of her male colleague, Mr. Pickering (Male), listed herein above, who received no discipline for said work performance failures and who received favorable treatment compared to Ms. Johnson.

101. Throughout the course of her employment, Ms. Johnson provided loyal and diligent service to GRUBB.

102. The real reason GRUBB maliciously and unlawfully harassed and singled out Ms. Johnson was because of her sex (female) and her disability.

103. Further, GRUBB retaliated against Ms. Johnson for exercising her rights under the ADAAA, specifically, asking for and using limited medical leave to receive surgery and post-op treatment for her disabilities.

104. GRUBB's actions toward Ms. Johnson were knowing and intentional, willful, malicious, and/or reckless, and were carried out with complete disregard for the consequences of such actions and Ms. Johnson's rights under federal law.

105. GRUBB's decision to terminate Ms. Johnson was an act of ongoing intentional retaliation because Ms. Johnson requested accommodations and time off work for purposes of treatment of her physical impairments (disabilities).

106. GRUBB's terminated Ms. Johnson because of her physical condition, which is inherent to her sex (female). Additionally, GRUBB discriminated against Ms. Johnson because of her sex by terminating her for the work performance failures of her male colleague, who was treated more favorably by GRUBB.

107. Ms. Johnson has been deprived of employment opportunities and has otherwise been subjected to GRUBB's discrimination, interference, and retaliation for requesting a reasonable accommodation, and intentional discrimination regarding her rights under the ADAAA and because of her sex under Title VII, which has caused her to suffer economic losses, including lost wages and benefits, as well as future pecuniary losses, interest, reasonable attorney fees, emotional pain, suffering, inconvenience, mental anguish, including fear for her ability to continue required medical treatment for herself and her family, loss of enjoyment of life, and other non-pecuniary losses and damages, in violation of the ADAAA, and Title VII prohibiting discrimination and retaliatory treatment and unlawful termination.

## VI. CAUSES OF ACTION

### Count I: Americans with Disabilities Act (As Amended)<br>Failure to Accommodate, Interference, Retaliation, and Disparate Treatment

*Plaintiff repeats, re-alleges, and incorporates the paragraphs above as if fully set forth herein.*

108. The ADA Amendments Act of 2008 (ADAAA) applies to Plaintiff's ADA claims of its failure to accommodate, its interference, and its retaliation against Plaintiff, because those actions took place on or after January 1, 2009. Pub. L. 110–325, § 8, 122 Stat. 3553 (Sep. 25, 2008), codified at e.g., 42 U.S.C. § 12101 *et seq.*

109. Defendant(s) conduct, as alleged in the numbered paragraphs above, is in violation of Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12101 *et seq*.

110. Specifically, said violation(s) occurred as a result of Defendant's failures, after receipt of medical documentation or information that detailed related work restrictions and physical impairments, to adhere to Plaintiff's requests for reasonable accommodations pursuant to the ADAAA, by failing to provide fully uninterrupted medical leave, and allow an exception to GRUBB's dress code; Defendant's failure(s) to engage in an interactive process, in good faith, with Plaintiff on how to implement or effect appropriate reasonable accommodations. Plaintiff was also regarded and known by Defendant to have actual and recorded disabilities pursuant to the ADAAA and suffered disparate treatment as a result of her specific impairments.

111. Defendant's conduct, as specifically alleged in paragraphs above, constituted violations of Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12203(a)-(b). Specifically, said violation(s) occurred as a result of Defendant's retaliatory actions against Plaintiff following her request and use of medical leave and request to allow an exception to GRUBB's dress code as reasonable accommodations pursuant to the ADAAA; and, Defendant's interference with Plaintiff's right to engage in an interactive process, in good faith, on how to implement or effect appropriate reasonable accommodations.

112. At all relevant times, Plaintiff was a "qualified employee" pursuant to 42 U.S.C. § 12111(8) of the ADAAA.

113. At all relevant times, Defendant was a "covered" employer pursuant to 42 U.S.C. § 12111(5)(A) of the ADAAA.

114. Plaintiff was *regarded as* and known by Defendant to have actual, and recorded, physical impairments that were long-lasting or permanent in nature and substantially limited Plaintiff in several major life activities, including but not limited to her ability to sleep as normal, ability to concentrate, walk, to exercise, sit for an extended period, perform household chores,

parenting tasks such as picking up her child, her ability to socialize due to fatigue and anemia and heavy menstrual cycles with constant bleeding, thinning hair and loss of energy compared to normal levels before she suffered with menorrhagia, hot flashes, mood swings, and chaffing due to constant use of feminine products meant to be used for short terms and not everyday use, as well as uterine fibroids and enlarged uterus, as compared to what the average person without said impairments would be capable of performing.

115. These symptoms, as described above, affected Ms. Johnson for over a year before receiving medical advice that she undergo a hysterectomy in November 2023. Following her hysterectomy, and the removal of one ovary, Ms. Johnson also suffered substantial limitation to the operation of major bodily functions, including functions of her bladder, endocrine and reproductive functions.

116. Additionally, Defendant refused to grant a reasonable accommodation when Plaintiff requested an exception to Defendant's dress code, allowing Plaintiff not to wear high-heeled shoes while recovering from a hysterectomy, including removal of an ovary, forcing her to continue suffering physical pain.

117. Defendant also unlawfully discriminated against Plaintiff because she was regarded as disabled, as well as additionally, known to be, actually and recorded as disabled by Defendant pursuant to the definitions provided in the ADAAA.

118. Subsequently, after being terminated, Ms. Johnson was replaced by Amanda Davis, who is not known or regarded as disabled under the ADAAA by GRUBB and is not known by GRUBB to suffer from menorrhagia or uterine fibroids or an enlarged uterus, or have undergone a hysterectomy with the removal of an ovary.

119. Further, Defendant's verbal warning discipline of Plaintiff the day after she returned to work on January 23, 2024 was unreasonable and unlawful and penalized her for previous requests and use of a reasonable accommodation, time off work or leave taken as a reasonable accommodation, thus unlawfully retaliating against Plaintiff and interfering with her exercise and enjoyment of rights granted under the ADAAA.

**Count II: Title VII of the Civil Rights Act of 1964**
**Sex Discrimination: Disparate Treatment**

120. Defendant(s)' conduct as alleged in the numbered Paragraphs above violated Plaintiff's rights conferred by Title VII of the Civil Rights Act of 1964, because she was treated in an adverse manner because of physical traits and characteristics inherent to her sex, as she was a female adversely treated both through discipline and termination of employment compared to male employee comparators and employee comparators who have not endured prolonged menstrual bleeding, uterine fibroids, hysterectomy and removal of an ovary.

121. Specifically, Plaintiff, who was known to have undergone a hysterectomy and removal of an ovary by Defendant(s), was subjected to discriminatory discipline (verbal warning) and termination because her physical and emotional distress directly related to hysterectomy surgery and post-op recovery.

122. Without a legitimate and non-discriminatory business reason, Defendant enforced disciplinary action based on false and misleading allegations against Plaintiff, a female recovering from a hysterectomy and removal of her ovary, compared to male employee comparators and other employee comparators not recovering from a hysterectomy and removal of an ovary.

123. Additionally, Defendant refused to grant an exception to Defendant's dress code, allowing Plaintiff not to wear high-heeled shoes while recovering from a hysterectomy, including removal of an ovary, forced her to continue suffering physical pain.

124. The alleged reason for Plaintiff's termination was alleged work performance problems and deficiencies. These claims against Plaintiff were false and were made in a discriminatory manner, rather than against a similarly situated male employee who was responsible for the deficient work performance. Accordingly, Plaintiff was terminated on account of her sex, and because she required a hysterectomy and removal of an ovary, which represents traits and characteristics inherent to her sex.

## VII. PRAYER FOR RELIEF

***WHEREFORE****, Plaintiff respectfully prays this Honorable Court:*

A. Declare and adjudge that Defendant violated Plaintiff's rights under 42 U.S.C. § 12101 et seq. and 42 U.S.C. §§ 2000e et seq.;

B. Reinstate Ms. Johnson to her former position of employment and order Defendant order Defendant to immediately cease and desist from all retaliatory and discriminatory behavior as described in this Complaint;

C. Award Plaintiff nominal damages;

D. Award Plaintiff compensatory damages, including appropriate back-pay, based on an annual salary of $85,000 plus benefits, including but not limited to Shared Rewards, Afternoon Shift Premium, Evening Shift Premium, Vacation Pay, Holiday Pay, unpaid social security quarters, bonuses, and contributions to any applicable 401K or similar retirement account;

E. Award an amount to offset additional tax liability incurred by Plaintiff for any award of back-pay which she would not have incurred had she received pay and benefits from Defendant in the regular course of employment;

F. Award Plaintiff compensatory damages, including emotional pain and suffering;

G. Award all out-of-pocket expenses and debts incurred by Plaintiff, including but not

limited to, the regular and desperately needed monthly costs for medical treatment, other unpaid medical bills incurred and pursued be collections, and any loans needed to sustain basic living requirements and child care, and costs incurred of losing her home and rehousing closing and moving and storage costs;

H. Award Plaintiff punitive damages;

I. Award Plaintiff the costs of this action and reasonable attorney's fees;

J. Award Plaintiff pre-judgment and post-judgment interest on the foregoing sums;

K. Award Plaintiff such other relief as the Court deems just and proper, including the award of costs and fees.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

**Respectfully submitted,**

s/ Steve Wilson
Steve Wilson, BPR#28460
The Steve Wilson Firm
5100 Poplar Ave., Ste. 2700
Memphis, TN 38137
Tel: 901-337-1300
Fax: 901-372-1446
steve@stevewilsonfirm.com

s/ Matt Gulotta
Matt Gulotta, BPR#28194
The Gulotta Firm, PLLC
202 Adams Ave.
Memphis, TN 38103
Tel: 901-213-6648
Fax: 901-424-1296
matt@gulottalaw.net